## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| UNITED STATES of AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **Criminal No.** |
| MUHAMED MUBAYYID and | ) | **05-40026-FDS** |
| EMADEDDIN Z. MUNTASSER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

## MEMORANDUM AND ORDER ON
## <u>DEFENDANTS' MOTION TO DISMISS</u>

**SAYLOR, J.**

This is a criminal prosecution under 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 371 (conspiracy to defraud the United States), and 26 U.S.C. § 7206(1) (false statements on tax returns).  In essence, the indictment charges that defendants Muhamed Mubayyid and Emadeddin Z. Muntasser fraudulently obtained a charitable exemption under § 501(c)(3) of the Internal Revenue Code for an entity known as Care International, Inc.  According to the indictment, defendants concealed the fact that Care solicited and distributed funds for, and issued publications supporting and promoting, Islamic holy war ("jihad") and holy warriors ("mujahideen").

Defendants have moved to dismiss the indictment on multiple grounds, not all of which are entirely clear.  In essence, defendants appear to contend that the indictment should be dismissed (1) because the prosecution violates defendants' rights of free speech and free exercise of religion under the First Amendment; (2) because the indictment and prosecution violate defendants' right to fair notice under the Due Process Clause of the Fifth Amendment; and (3) because the prosecution was unlawfully selective and vindictive in violation of the Due Process and Equal

Protection Clauses of the Fifth Amendment.  For the reasons set forth below, the motion will be denied.

I.      **Background**

        On May 11, 2005, a grand jury returned an indictment charging defendants Mubayyid and Muntasser with one count of scheming to conceal material facts in violation of 18 U.S.C. § 1001(a)(1) and one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371.  The indictment also charges Mubayyid with three counts of filing a false tax return in violation of 26 U.S.C. § 7206(1) and Muntasser with one count of making false statements in violation of 18 U.S.C. § 1001(a)(2).[1]

        In support of these charges, the indictment alleges the following facts.

        A.      **Al-Kifah Refugee Center and Incorporation of Care International, Inc.**

        In the early 1990's, Emadeddin Muntasser was involved in operating the Boston branch office of the Al-Kifah Refugee Center, an organization that supported Muslim holy warriors ("mujahideen") engaged in violent, religious-based conflict ("jihad").[2]  The Boston office of Al-Kifah published a pro-jihad newsletter entitled "Al-Hussam," which is an Arabic term meaning "the Sword."

        In 1993, media reports linked Al-Kifah's New York office to the bombing of the World

---

        [1] Muntasser has moved separately, under seal, to dismiss the false statements charge under § 1001(a)(2). The Court will address that motion in a separate memorandum and order.

        [2] The indictment defines "jihad" to mean "violent, religiously-based [sic] military conflict overseas." Indictment, ¶ 1.  Defendants dispute this definition, contending that "jihad" in fact means "utmost effort" or "struggle" and refers to the obligation of all Muslims to promote and defend Islam.  However, in considering a motion to dismiss, the Court assumes all allegations set forth in the indictment to be true.  *United States v. Sampson*, 371 U.S. 75, 78-79 (1962).  Accordingly, for purposes of this motion to dismiss, the Court will accept the indictment's definitions.

Trade Center.  Shortly thereafter, Muntasser founded and incorporated Care International, Inc., in Massachusetts.  According to its articles of incorporation, Care was "organized exclusively for charitable, religious, educational, and scientific purposes including, but not limited to, engage in, establish, promote, contribute and carry out human welfare, charitable and relief activities, programs, projects, organizations, institutions and funds."  Muntasser served as its president from 1993 to 1996.[3]

The indictment alleges that Care, like Al-Kifah, was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad.  It further alleges that Care was located at Al-Kifah's Boston office and assumed publication of its Al-Hussam newsletter.

### B.     Alleged Misrepresentations in IRS Form 1023

Shortly thereafter, Muntasser filed an application with the Internal Revenue Service, pursuant to 26 U.S.C. § 501(c)(3), seeking tax-exempt status for Care on the grounds that it was a charitable organization.  An organization seeking such an exemption must submit an IRS Form 1023 (Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code).  Form 1023 requires the organization to demonstrate that it is organized and operated exclusively for charitable purposes, and that any non-exempt purpose is incidental and not substantial to its operation.[4]  The IRS's initial determination as to whether an organization

---

[3] The role of Mubayyid, if any, in the affairs of Care from 1993, when it was founded, to 1997, when he became its treasurer, is not set forth in the indictment.

[4] Form 1023 instructs applicants:

Provide a detailed narrative description of all the activities of the organization—past, present, and planned.  Do not merely refer to or repeat the language in your organizational document. Describe each activity separately in the order of importance.  Each description should include, at

qualifies for tax-exempt status is based upon the information provided in Form 1023.

The Form 1023 filed by Muntasser stated that Care was recently incorporated; that it would become operational shortly; and that it would provide charitable services, such as "provid[ing] assistance to victims of natural and man-made disasters . . . primarily in Bosnia and later in African countries. . . . [and] develop[ing] a program for orphan sponsorships." Copies of Care's articles of incorporation and by-laws were attached to the Form 1023.

Among other things, the Form 1023 asked whether "the organization [is] the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other factors," and required the applicant to "explain" if the answer was "yes." Muntasser answered "no" to this question.

Muntasser filed the Form 1023 on behalf of Care in June 1993. He signed the form under the pains and penalties of perjury, affirming that the "application, including the accompanying schedules and attachments, . . . to the best of my knowledge . . . is true, correct, and complete."

The indictment alleges that defendants knowingly and willfully schemed to conceal material information from the IRS in connection with the application—specifically, that Care planned to solicit and distribute contributions for, and issue publications supporting and promoting, jihad and the mujahideen. The indictment further alleges that defendants schemed to conceal the fact that Care was an outgrowth of, and successor to, Al-Kifah.

The IRS granted Care tax-exempt status in October 1993. The letter notifying Muntasser of this decision instructed him to report any changes in Care's "purposes, character, or method of

---

a minimum, the following: (a) a detailed description of the activity including its purpose; (b) when the activity was or will be initiated; and (c) where and by whom the activity will be conducted.

operation" to the IRS.[5]

### C.    Alleged Misrepresentations in IRS Form 990

An organization that has been granted tax-exempt status pursuant to § 501(c)(3) is required to file an IRS Form 990 (Return of Organization Exempt from Income Tax) for each year in which its contributions received exceed $25,000.  The information provided in Form 990 is used by the IRS to determine, among other things, whether an organization that has been granted tax-exempt status remains so qualified.  If the IRS determines that an organization is no longer operating consistently with its tax-exempt status, that status will be revoked.

Muhamed Mubayyid served as Care's treasurer from 1997 to 2003.  From 1993 to 2003, Care—acting through Muntasser, Mubayyid, and others—filed various Form 990 returns with the IRS.  Question 76 on each Form 990 asked whether the organization has engaged in any activity not previously reported to the IRS.  None of the returns reported any changes in Care's activities from the Form 1023, or disclosed that Care was engaged in activities involving the solicitation and expenditure of funds to support and promote the mujahideen and jihad, including the distribution of pro-jihad publications.

### D.    Alleged Misrepresentations to FBI and INS

Finally, the indictment alleges that Muntasser made material misrepresentations and omissions to the Federal Bureau of Investigation and to the Immigration and Naturalization

---

[5] If the IRS grants an organization tax-exempt status under § 501(c)(3), any donations made to that organization are tax-deductible.  The indictment alleges that between 1993 and 2003, Care collected approximately $1.7 million in tax-deductible donations.

Service.[6]  Muntasser was interviewed by the FBI's Joint Terrorism Task Force in April 1999 and

April 2003.  At both interviews, Muntasser stated that Care was a charitable organization and did

not disclose that it was engaged in activities supporting jihad and the mujahideen.  During the

April 1999 interview, Muntasser disclosed a trip he made to Pakistan in 1994 or 1995, but

concealed the fact that during that trip he also traveled to Afghanistan in furtherance of Care's

activities.  During the April 2003 interview, he expressly denied traveling to Afghanistan.

In October 2002, Muntasser submitted an Application for Naturalization to the INS.  In

the naturalization application, he did not disclose his association with Care or Al-Kifah and the

fact that he had traveled to Afghanistan.  However, when interviewed by the Department of

Homeland Security in November 2003 and April 2004, Muntasser admitted his membership in Al-

Kifah and Care from 1993 to 1996 and having traveled to Pakistan and Afghanistan in 1994 and

1995.

## II.   Analysis

Fed. R. Crim. P. 12(b)(2) provides that "[a] party may raise by pretrial motion any

defense, objection, or request that the court can determine without a trial of the general issue."

Here, defendants have filed a pretrial motion seeking to dismiss the indictment in its entirety.

"An indictment, or a portion thereof, may be dismissed if it is otherwise defective or

subject to a defense that may be decided solely on issues of law."  *United States v. Labs of

Virginia, Inc.*, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003); *see also United States v. Flores*, 404

F.3d 320, 324 (5th Cir. 2005); *United States v. Tawahongva*, 456 F. Supp. 2d 1120, 1125 (D.

---

[6] The relevant functions of the former Immigration and Naturalization Service have been subsequently transferred to the Department of Homeland Security.

6

Ariz. 2006).  In considering a motion to dismiss an indictment, the Court assumes all facts in the

indictment to be true and views all facts in the light most favorable to the government.  *United*

*States v. Sampson*, 371 U.S. 75, 78-79 (1962); *United States v. Ferris*, 807 F.2d 269, 271 (1st

Cir. 1986).  To the extent a motion to dismiss relies on disputed facts, the motion should be

denied.  *United States v. Covington*, 395 U.S. 58, 60 (1969); *see also United States v. Caputo*,

288 F. Supp. 2d 912, 916 (N.D. Ill. 2003).

"An indictment returned by a legally constituted and unbiased grand jury, like an

information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge

on the merits."  *Costello v. United States*, 350 U.S. 359, 363 (1956).  The Supreme Court has

held that "an indictment is sufficient if it, first, contains the elements of the offense charged and

fairly informs a defendant of the charge against which he must defend, and, second, enables him to

plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v.*

*United States*, 418 U.S. 87, 117 (1974) (citing *Hagner v. United States*, 285 U.S. 427 (1932);

*United States v. Debrow*, 346 U.S. 374 (1953)).[7]

---

[7] Defendants also contend that the indictment should be dismissed because they did not make false statements or conceal material information on Forms 1023 or 990.  Specifically, defendants state that Care's articles of incorporation, which were attached to the Form 1023 submitted by Muntasser, indicated that it was organized for "religious" and "educational" purposes.  They then contend that the activities that they allegedly concealed—soliciting and expending funds to support and promote jihad and the mujahideen, and publishing pro-jihad materials—were in fact "religious" and "educational" in nature.  At oral argument, defendants also contended that the only "support" the government will be able to prove at trial that Care provided to the mujahideen was in the form of aid to widows and orphans of mujahideen fighters in Afghanistan.  They also note that in Form 1023, Muntasser disclosed that Care would "provide assistance to victims of . . . man-made disasters" (which, defendants contend, includes war and rebellion) and that it would develop sponsorship programs for orphans in various countries including Afghanistan.

Effectively, defendants are asking the Court to make an evidentiary determination as to what activities they engaged in and as to whether they made adequate representations on their IRS forms.  The Court may not conduct such inquiries at this stage of the proceeding.  *See United States v. Maceo*, 873 F.2d 1, 3 (1st Cir. 1989) ("A court should not inquire into the sufficiency of the evidence before the indicting grand jury . . . .").

A.     **The First Amendment Claims**

Defendants first contend that the prosecution violates their rights of free speech and free

exercise of religion as protected by the First Amendment.  Defendants argue at some length that

the government is attempting to criminalize constitutionally protected activities, such as collecting

funds for charitable activities, distributing literature, and expressing religious and political beliefs.

That argument, however, entirely mischaracterizes the nature of the indictment.  Defendants are

not being prosecuted for *engaging* in those activities; they are being prosecuted for *concealing*

those activities, in their application for tax-exempt status and elsewhere.

In addition to their general claim that the government is attempting to criminalize

protected activity, defendants assert three specific First Amendment claims:  (1) that the

prosecution substantially and unlawfully burdens the free exercise of their religion; (2) that the

information they allegedly concealed was not material, because the IRS could not properly deny

them § 501(c)(3) status based on their speech or religious activities; and (3) that the overt acts

underlying the conspiracy charge are constitutionally protected activities that may not properly

form the basis for a criminal prosecution.  Each of these contentions is without merit.

1.     **The Alleged Burden on Free Exercise of Religion**

Under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, the federal

government may not "substantially burden a person's exercise of religion even if the burden

results from a rule of general applicability," except where the burden "is in furtherance of a

compelling governmental interest" and "is the least restrictive means of furthering that compelling

governmental interest."  42 U.S.C. § 2000bb-1.  *See Gonzales v. O Centro Espirita Beneficente*

*Uniao Do Vegetal*, 546 U.S. 418 (2006).

Defendants cite that authority in support of their motion to dismiss, but fail to specify how the statute or the underlying principles apply in the context of this prosecution. Defendants do not contend that their religion requires that they conceal information, defraud the government, or make false statements. They do not contend that the charging statutes—18 U.S.C. § 1001 (false statements), 18 U.S.C. § 371 (conspiracy to defraud the United States), and 26 U.S.C. § 7206(1) (false statements on tax returns)—burden their free exercise rights. And they do not appear to contend that the requirement set forth in 26 C.F.R. § 1.501(c)(3)-1(b)(1)(v), that an applicant for tax-exempt status "submit a detailed statement of its proposed activities," somehow places a substantial burden on the exercise of their religion.[8]

The Court sees no reason why providing a complete and truthful description of the organization's planned activities in order to obtain tax-exempt status—whether or not those activities are religiously motivated—inhibits or substantially burdens the exercise of religious freedom. Accordingly, the claim of undue burden on the free exercise of religion is without merit.

## 2.    The Alleged Lack of Materiality

Defendants next contend that the information they allegedly concealed was not material because that information could not properly have influenced the IRS's determination as to whether Care qualified for § 501(c)(3) status.

To subject a defendant to criminal liability, a false statement must be "material." *See United States v. Notarantonio*, 758 F.2d 777, 785 (1st Cir. 1985). A materially false statement is one that "had a natural tendency to influence, or was capable of influencing, the decision of a

---

[8] Defendants did not seek to obtain tax-exempt status for Care as a church or religious organization, and indeed the Form 1023 application and Form 990 returns contain no references to religious activities.

9

government agency in making a determination required to be made." *Id.* (quotation and internal citation omitted). "The government need not show that the agency was actually influenced by the statements involved." *Id.*

The indictment expressly states that had defendants provided truthful information concerning Care's activities to the IRS, Care would not have been accorded tax-exempt status. Indictment, ¶ 15. Defendants, however, contend that under the "unconstitutional conditions" doctrine, the IRS could not have constitutionally denied Care's application for § 501(c)(3) based on the information that was concealed, and therefore the information was not material.

Under the "unconstitutional conditions" doctrine, the government may not condition the granting of a benefit on the beneficiary's surrender of a constitutional right, even if the government could withhold that benefit altogether. *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983); *Clifton v. Federal Election Comm'n*, 114 F.3d 1309, 1315 (1st Cir. 1997). Thus, for example, in *Speiser v. Randall*, 357 U.S. 513 (1958), the Supreme Court held that a California rule that conditioned a tax exemption on the taxpayer signing a declaration that he would not advocate the violent overthrow of the government was an unconstitutional condition. In so holding, the Court stated that "[t]o deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Speiser*, 357 U.S. at 518.

Here, defendants contend that the IRS could not have denied Care's application for § 501(c)(3) status based on the fact that it engaged in constitutionally protected activities, such as soliciting funds, publishing literature, and expressing religious or political views. Although it is true that the IRS may not deny tax-exempt status based solely on the exercise of First Amendment

rights, it does not follow that this prosecution is improper.

First, defendants do not have a right, constitutional or otherwise, to provide false responses to the IRS, even to questions they contend the IRS had no right to ask. The Supreme Court has stated that

> it cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.

*Bryson v. United States*, 396 U.S. 64, 72 (1969). As the Court in *Bryson* indicated, "[a] statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001." 396 U.S. at 71. Here, the IRS clearly had statutory and regulatory authority to inquire about Care's proposed activities. *See, e.g.*, 26 C.F.R. § 1.501(c)(3)-1(b)(1)(v) (expressly requiring an applicant for tax-exempt status to "submit a detailed statement of its proposed activities"). Accordingly, defendants may be prosecuted for providing knowingly false responses regarding those activities.[9]

Second, the unconstitutional conditions doctrine would not preclude the IRS from denying Care § 501(c)(3) status based on the nature of its activities. Although defendants are correct that "the government may not deny a benefit to a person because he exercises a constitutional right," the government need not subsidize defendants' First Amendment activities out of public funds.

---

[9] Defendants further contend that the IRS cannot insist that an applicant for tax-exempt status answer questions about his or her organization's political convictions, religious affiliation, or belief system. For example, defendants contend that the IRS could not require an applicant to answer whether the organization will adhere to Islamic precepts. It is unclear why defendants are making this argument, as it has no apparent relevance to the present case. Forms 1023 and 990 did not ask any such question of the defendants, and defendants are not being prosecuted for concealing Care's political convictions, religious affiliation, or belief system.

*Regan*, 461 U.S. at 545.  Through the Internal Revenue Code, Congress has provided that only a

limited class of charitable activities should be subsidized by the § 501(c)(3) tax exemption.  *See* 26

U.S.C. § 501(c)(3).[10]  The IRS could reasonably conclude that Care's efforts to support and

promote armed conflict are not charitable or religious in nature and could deny tax-exempt status

on that basis.  *See Regan,* 461 U.S. at 545.[11]  The government is not required to grant a tax

subsidy to organizations providing funds to support violent activities.  Alternatively, the IRS

might have concluded that the activities were against public policy and denied tax-exempt status

on that basis.  *See Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983).[12]

Finally, even assuming that the IRS could not deny Care's tax exemption based on its

constitutionally-protected activities, it does not follow that information regarding these activities

is immaterial to the § 501(c)(3) determination.  "The test is not whether the false statement was

the determinative factor in [a government agency's] decision, but rather, whether the statement

---

[10] Section 501(c)(3) permits tax-exempt status for the following types of organizations:

Corporations, and any community chest, fund, or foundation, organized and operated exclusively
for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or
to foster national or international amateur sports competition (but only if no part of its activities
involve the provision of athletic facilities or equipment), or for the prevention of cruelty to
children or animals, no part of the net earnings of which inures to the benefit of any private
shareholder or individual, no substantial part of the activities of which is carrying on
propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in
subsection (h)), and which does not participate in, or intervene in (including the publishing or
distributing of statements), any political campaign on behalf of (or in opposition to) any
candidate for public office.

[11] Care could have, at least theoretically, adopted a dual structure, with one organization exclusively
organized and operated for charitable exempt purposes (and thereby entitled to § 501(c)(3) status), and with
another separate organization engaged in non-charitable activities.

[12] Defendants argue that support of mujahideen in Afghanistan did not become contrary to the public
policy of the United States until 1995, after Care's Form 1023 was submitted.  Even assuming that to be true– and
the Court expresses no view on the subject– disclosure of Care's true activities would nonetheless have been
material to the IRS in the decision-making process.

had a natural tendency to influence the [government agency]." *United States v. Mitchell*, 388

F.3d 1139, 1143 (8th Cir. 2004) (citing *United States v. Robertson*, 324 F.3d 1028, 1030 (8th

Cir. 2003) (holding that, although the defendant made a confession sufficient to support a

conviction for the charged crime, the defendant's associated false statements to investigating law

enforcement officers were still material because they had a natural tendency to influence the

course of the investigation)).  Information regarding Care's activities, even if not the dispositive

factor, would have a natural tendency to influence the IRS's investigation of Care's § 501(c)(3)

eligibility.  For example, had the IRS known that Care planned to support armed fighters engaged

in military conflict, it might have subjected its § 501(c)(3) application to closer scrutiny.  The IRS

might have requested additional information regarding Care's intended expenditures, in order to

ensure that it was not materially supporting terrorism or engaging in other illegal activity.  The

Court cannot conclude that information regarding Care's proposed activities was necessarily

immaterial as a matter of law.[13]

---

[13] Defendants also point to 26 C.F.R. § 1.501(c)(3)-1(d)(2), which states as follows:

> [t]he fact that an organization, in carrying out its primary purpose, advocates social or civic
> changes or presents opinion on controversial issues with the intention of molding public opinion
> or creating public sentiment to an acceptance of its views does not preclude such organization
> from qualifying under section 501(c)(3) so long as it is not [an organization that attempts to
> influence legislation by propaganda or otherwise].

According to defendants, this regulation precluded the IRS from treating Care's speech and religious activities as
material to the tax exemption analysis.

That regulation, however, states merely that an organization's advocacy for social or civic changes, and its
presentment of opinions on controversial issues, will not preclude it from qualifying for § 501(c)(3) status.  It does
not provide that an organization can avoid submitting information concerning its proposed activities—a
requirement that is specifically mandated in another IRS regulation, § 1.501(c)(3)-1(b)(1)(v)—nor does it preclude
the IRS from considering such activities in determining whether the organization qualifies as a charity.  Finally,
even if the regulation did prevent the IRS from denying tax-exempt status based on Care's activities, it simply does
not follow that information regarding those activities is necessarily immaterial to the decision-making process.

For the all of these reasons, defendants' contention that the allegedly concealed information could not have influenced the IRS's tax exemption determination, and therefore was not material, must be rejected.

### 3.    The Overt Acts Charged in the Conspiracy

Count Two of the indictment charges defendants Muntasser and Mubayyid with conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  Defendants contend that this charge is based on activities that are protected by the First Amendment and therefore must be dismissed.  Specifically, defendants describe the following activities engaged in by Care—which are listed in the indictment either as the manner and means of the conspiracy, or as overt acts of the conspiracy—as constitutionally protected:

- publishing "reports and articles in support of the mujahideen in its newsletter or on its website."

- distributing "brochures entitled 'Zakat Calculation Guide,' in which the mujahideen was identified as one of the eight categories of eligible recipients."

- publishing a website that "contained direct solicitations for tax deductible donations to support the mujahideen."

- publishing and distributing "a newsletter, Al-Hussam . . . which actively promoted 'jihad,' or holy war, involving 'mujahideen,' or Islamic holy warriors."

- publishing "articles about the military operations and activities of the mujahideen on its website."

- printing and distributing "solicitations for tax deductible donations to support the mujahideen."

- publishing and distributing "an English translation of 'Join the Caravan,' a pro-jihad book authored by Abdullah Azzam."

The Court need not determine whether these activities are in fact protected by the First

14

Amendment, because even constitutionally protected speech may constitute an overt act in a conspiracy charge.  *See United States v. Donner*, 497 F.2d 184, 192 (7th Cir. 1974); *see also United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for . . . speech-based offenses merely because one commits them through the medium of political speech or religious preaching.").  It is the "agreement that is punishable in a conspiracy charge and not the overt act itself."  *United States v. Al-Arian*, 308 F. Supp. 2d 1322, 1342 (M.D. Fla. 2004).  The conspiracy charge is therefore valid and not subject to dismissal.

### B.        The Due Process Claims—Fair Notice

Defendants next contend that they were not provided fair notice that their conduct was illegal, in violation of their rights to due process of law under the Fifth Amendment.  "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'"  *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (internal citation omitted).  A criminal statute must "give fair warning of the conduct that it makes a crime."  *Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964).  The rule of lenity, a manifestation of the fair warning requirement, "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).  The rule of lenity, however, is only applicable when no other means is available to resolve statutory ambiguity.  *See United States v. Johnson*, 529 U.S. 53, 59 (2000).

15

Defendants do not suggest that the charging statutes are themselves ambiguous, nor do they claim they did not know it was illegal to make false statements to the government, to conspire to defraud the government, or to make false statements on tax returns.  Rather, defendants' due process argument appears to be premised on three theories.  First, they argue that numerous government-funded charities engaged in precisely the types of activities that now form the basis for this prosecution, and that defendants therefore could not have known that these activities were unlawful.  Second, they argue that defendants were not given clear notice that information concerning Care's support of jihad and the mujahideen was material to the government's § 501(c)(3) determination, and therefore had to be disclosed on Forms 1023 and 990.  Third, they argue that, the question on Form 1023 asking whether Care was the "successor" to or "outgrowth" of another organization was "fundamentally ambiguous" and that therefore prosecution under a false statement theory is improper.

### 1.     Alleged Activities of Other Organizations

First, defendants argue at considerable length that various other organizations engaged in similar activities to support and promote jihad and the mujahideen and were nonetheless granted § 501(c)(3) status.  Although it is not clear, defendants appear to argue that they could have reasonably relied upon these prior IRS determinations in determining what constitutes charitable conduct and activities needed to be disclosed on Forms 1023 and 990.

Whatever the merits of this argument as a factual defense—and the Court expresses no view on the subject—it constitutes, at most, an evidentiary issue, and certainly not a basis for dismissing the indictment.  Furthermore, and in any event, there is no evidence in the record that defendants were even aware of these organizations or their tax-exempt status, or that they

16

reasonably relied on any prior rulings of the IRS.

### 2.   Alleged Lack of Notice as to What Information Was Material to the IRS

Second, defendants contend that they were not given clear notice that their activities were material to the § 501(c)(3) determination, and that they were thus unaware that they had to disclose these activities to the IRS.  This contention is likewise without merit.  Form 1023 clearly instructs the applicant to "[p]rovide a detailed narrative description of *all* the activities of the organization—past, present and planned."  IRS Form 1023 (emphasis added). The applicable IRS regulation is equally clear, requiring the applicant to "submit a detailed statement of its proposed activities."  26 C.F.R. § 1.501(c)(3)-1(b)(1)(v).  More fundamentally, however, whether defendants knew the information was material is irrelevant.  In determining whether a defendant knowingly and willfully made false statements in violation of 18 U.S.C. § 1001 and 26 U.S.C. 7206(1), the issue is "defendant's knowledge of the falsity of the statements," not "defendant's knowledge of the statement's materiality to the federal agency involved."  *Notarantonio*, 758 F.2d at 785 n.4; *see also United States v. Boulerice*, 325 F.3d 75, 82 (1st Cir. 2003).

### 3.   Alleged Vagueness of "Successor" or "Outgrowth" Question

Third, defendants challenge the portion of the indictment that charges them with concealing that Care was an "outgrowth of" and "successor to" Al-Kifah.  Defendants contend that the terms "outgrowth" and "successor," set forth in Question 5 of Part II of the 1993 version of Form 1023 ("Question 5") were fundamentally ambiguous, and therefore cannot form the basis of a prosecution for making a false statement.

A question that is "fundamentally ambiguous" cannot support a false statement

prosecution.  *See, e.g., United States v. Richardson*, 421 F.3d 17, 33 (1st Cir. 2005); *United States v. Farmer*, 137 F.3d 1265, 1268-69 (10th Cir. 1998).  "When the question that led to the allegedly false response is fundamentally ambiguous, we cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made."  *United States v. Manapat*, 928 F.2d 1097, 1101 (11th Cir. 1991).  Otherwise, however, issues of ambiguity are for the jury to resolve.  *United States v. Damrah*, 334 F. Supp. 2d 967, 972 (N.D. Ohio 2004) ("Generally, questions of ambiguity are left to the jury to resolve."); *Richardson*, 421 F.3d at 33 ("where a question is only arguably ambiguous, 'it is for the jury to decide . . .'").  In considering a potentially ambiguous question, context is "critically important."  *Richardson*, 421 F.3d at 33.

The difference between a question that is "fundamentally ambiguous" and merely "ambiguous" cannot be exactly defined.

> To precisely define the point at which a question becomes fundamentally ambiguous, and thus not amenable to jury interpretation, is impossible.  Courts have nevertheless recognized that . . . [a] question is fundamentally ambiguous when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.

*Richardson*, 421 F.3d at 34 (quotation and internal citation omitted).  In the words of the Second Circuit, "The phrase 'fundamentally ambiguous' has itself proven to be fundamentally ambiguous."  *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986).

Defendants are charged here with answering the following question falsely:

> Is the organization the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other factors?

18

The terms "outgrowth" and "successor" were not defined in the instructions, which simply stated the following:  "Examples of special relationships are common officers and the sharing of office space or employees."

The question is not whether the terms "outgrowth" or "successor" are arguably ambiguous, or are susceptible of different shades of meaning, or difficult to apply in certain contexts; it is whether they are "fundamentally ambiguous" as a matter of law.  As noted, there is no fixed boundary between a question that is "fundamentally ambiguous" and one that is merely "ambiguous."  Nonetheless, under the circumstances, the Court concludes that persons of ordinary intellect would understand that an applicant was required to disclose, at the very least, (1) whether the organization was an offshoot or spin-off of another organization, or grew directly out of that organization ("outgrowth") or (2) whether it succeeded to, followed, continued the activities of, or took the place of another organization ("successor").  *See Damrah*, 334 F. Supp. 2d at 977 (defendant was put on fair notice that he was obligated to notify the INS of his "affiliation" with the Al-Kifah Refugee Center and other organizations).  The Court therefore concludes that Question 5 was not fundamentally ambiguous, and that the portion of the indictment charging defendants with concealing Care's relationship with Al-Kifah is valid.

C. **The Due Process and Equal Protection Claims—Selective or Vindictive Prosecution**

Defendants further contend that the indictment must be dismissed because they are being selectively prosecuted on the basis of their religion and vindictively prosecuted in retaliation for Muntasser's filing of a naturalization lawsuit.  Defendants, however, have failed to meet the heavy burden of producing clear evidence of selective or vindictive prosecution.

19

The Attorney General and United States Attorneys retain "broad discretion" as to whom to prosecute. *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quotation and internal citation omitted). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *see United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982) (prosecutor has "broad discretion" to select the charges against an accused).

Furthermore, the "decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. As the Supreme Court has explained:

> Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Id.* Judicial inquiry of prosecutorial decisions also threatens "the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* (quoting *Wayte*, 470 U.S. at 607).

Although prosecutorial discretion is broad, "it is not 'unfettered.'" *Wayte*, 470 U.S. at 608 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). Prosecutorial selectivity in the enforcement of criminal laws is subject to constitutional restraints, and thus "may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*,

20

517 U.S. at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).  Similarly, "the Due Process

Clause of the Fifth Amendment restrains a prosecutor from punishing a defendant 'for exercising a

protected statutory or constitutional right.'"  *United States v. Dwyer*, 287 F. Supp. 2d 82, 87 (D.

Mass. 2003) (quoting *Goodwin*, 457 U.S. at 372).  Nonetheless, the Supreme Court has

repeatedly stated that the standard of proving selective or vindictive prosecution claims "is

particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the

presumption that a prosecutor has acted lawfully."  *Reno v. American-Arab Anti-Discrimination

Comm.*, 525 U.S. 471, 489 (1999) (citing *Armstrong*, 517 U.S. at 463-65).

### 1.    Selective Prosecution

Defendants appear to argue that they are the subjects of unlawful selective prosecution.

Although it is far from clear, it appears that they are asserting that they have been prosecuted

because of their religion.

To overcome the presumption of prosecutorial good faith, the defendant must prove by

"clear evidence" that the decision to prosecute (1) had a discriminatory effect and (2) was

motivated by a discriminatory purpose.  *Armstrong*, 517 U.S. at 465; *Wayte*, 470 U.S. at 608; *see

United States v. Magana*, 127 F.3d 1, 8 (1st Cir. 1997) (to prove selective prosecution, defendant

must demonstrate by clear evidence "both that she has been singled out for prosecution when

others similarly situated have not been prosecuted and that the prosecutor's reasons for doing so

were impermissible") (internal citation omitted).  Here, defendants have failed to make either

showing.

### a.    Discriminatory Effect

To establish discriminatory effect, defendants must prove that similarly situated individuals

of a different religion could have been prosecuted, but were not. *See Armstrong*, 517 U.S. at 465.

A similarly situated person is "one who engaged in the same type of conduct, which means that

the comparator committed the same basic crime in substantially the same manner as the

defendant." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).

In their motion to dismiss, defendants contend that non-Muslim charities engaged in (and

continue to engage in) activities similar to those conducted by Care.  As an example, defendants

point to the Jewish National Fund, which defendants contend published information on its website

about Israel's military successes, and about the plight of the widows and orphans of Israeli

soldiers.  Defendants also suggest that a number of Jewish charities have conducted emergency

appeals to provide aid to the victims of the conflict between Israel and Lebanon.  Defendants also

point to the activities of Catholic and Protestant groups in Ireland.

Defendants fail to show, however, that these organizations have committed the same

crime in substantially the same way as defendants.  They have not proven that any of these groups

fraudulently obtained tax exemptions by making materially false statements, or by concealing

information regarding their activities or relationships with other groups.  Nor have defendants

demonstrated that these non-Muslim charities filed fraudulent tax returns or conspired to defraud

the United States.  Absent such evidence, defendants cannot establish discriminatory effect.

### b.    Discriminatory Purpose

Even if defendants could show discriminatory effect, they still would not prevail on their

selective prosecution claim, as they have failed to establish that the government has acted with a

discriminatory or impermissible purpose.

To show discriminatory purpose, defendants argue that only one prior prosecution in this

22

Circuit involved allegations that the founder of an organization granted tax-exempt status materially misrepresented his organization as charitable in nature.  Even assuming this prosecution is unique, however, that fact does not render the government's actions discriminatory.  As this Court has previously stated,

> there is nothing inherently wrong or suspicious in a prosecution that is legally and factually unique.  While the government may not, of course, single out a defendant for prosecution on race, religion, or other improper basis, it is not confined solely to routine prosecutions or well-worn statutory theories.  Moreover, it is entitled to re-evaluate its priorities and adapt to new threats.

*United States v. Lewis*, No. 05-40001, slip op. 13 n.11 (D. Mass. May 11, 2006).

Standing alone, the unique nature of this prosecution is insufficient to overcome the presumption that the government exercised its prosecutorial functions in good faith.  Because defendants have failed to prove, by clear evidence, that the government's reasons for bringing this prosecution were illegitimate, their claim of selective prosecution cannot stand.

## 2.   <u>Vindictive Prosecution</u>

 "It is hornbook law that a federal court may dismiss an indictment if the accused produces evidence of actual prosecutorial vindictiveness sufficient to establish a due process violation, or even if he demonstrates a likelihood of vindictiveness sufficient to justify a presumption." *United States v. Stokes*, 124 F.3d 39, 45 (1st Cir. 1997).  Here, defendants attempt to establish a "likelihood of vindictiveness sufficient to justify a presumption" by relying solely on the timing of the indictment.  According to defendants, Muntasser filed a lawsuit on June 8, 2004, in response to the Department of Homeland Security's failure to act on his 2002 petition for naturalization.  After granting the government two continuances in that case, Judge Zobel of this district scheduled a hearing for May 12, 2005, and indicated that no further delays would be permitted.

On May 11, 2005, the day before the scheduled hearing, the grand jury returned the indictment at issue here.  Defendants argue that the present prosecution was brought in an effort to block Judge Zobel's potential grant of citizenship to Muntasser.[14]

Timing alone is not sufficient to meet the heavy burden of proving, by clear evidence, that the prosecutor acted with a vindictive purpose.  *See, e.g., Goodwin*, 457 U.S. at 382 n.15 (presumption may not exist where "the only evidence [a defendant] is able to marshal in support of his allegation of vindictiveness is that the additional charge was brought at a point in time after his exercise of a protected legal right"); *United States v. Pimienta-Redondo*, 874 F.2d 9, 13 (1st Cir. 1989) ("the presumption does not apply indiscriminately to all instances of detrimental action treading close upon the heels of a defendant's exercise of some legal right" and should not "serve to block a legitimate response to criminal conduct") (quotation and internal citation omitted); *United States v. Falcon*, 347 F.3d 1000, 1005 (7th Cir. 2003) (affirming district court's denial of motion to dismiss for vindictive prosecution where defendant only offers evidence of suspicious timing for claim); *United States v. Awan*, 459 F. Supp. 2d 167, 187 (E.D.N.Y. 2006) ("In all events, attributing the timing of the government's decision to animus is, without more, mere speculation.").  Accordingly, defendants' vindictive prosecution claim, like their selective prosecution claim, is without merit.

Because defendants have failed to prove, by clear evidence, that they have been singled out for prosecution when others similarly situated have not been prosecuted, and that the prosecutor's reasons for doing so were discriminatory, vindictive, or otherwise impermissible,

---

[14] The government has submitted a affidavit from Special Agent James Marinelli of the FBI Joint Terrorism Task Force indicating that the investigation of defendants began prior to the time Muntasser filed his naturalization lawsuit.

their claims of selective and vindictive prosecution must be rejected.

**III.**     <u>**Conclusion**</u>

For the foregoing reasons, defendants' motion to dismiss is DENIED.

**So Ordered.**

<u>/s/ F. Dennis Saylor</u>
F. Dennis Saylor IV
United States District Judge

Dated: March 8, 2007